**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

MARK ROBERT MORAN,

Plaintiff,

v.

KALSHIEX LLC and KALSHI INC.,

Defendants.

Civil Action No. 1:26-cv-3008

**COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

## COMPLAINT

Kalshi listed a market on a decision only Mark Robert Moran could make. It sold positions in that market to the public and collected fees on the trades. When Moran traded in it, Kalshi barred him for five years, assessed $6,229.30, and told the public he had refused to settle. Moran does not ask this Court to authorize candidate trading. He challenges Kalshi's separate conduct in building a product out of his name, in monetizing it, and in enforcing its rules against him, and he seeks damages and narrowly tailored corrective relief.

## NATURE OF THE ACTION

1. Kalshi's own Notice of Disciplinary Action, File No. KE-2026-0003 (Ex. A), states that Moran was a "direct decision maker" with "direct influence" over the underlying event for a market asking who would run for public office.

2. At Moran's request, Kalshi's Head of Politics agreed to add Moran's name to a market on whether he would run for office, and the market went live the next day. By listing that market, Kalshi created a real-money financial interest for outside traders in whether, when, and how Moran made a political decision that Moran personally could cause or prevent.

3. After Kalshi alleged that Moran violated the exchange's decision-maker trading rule, Kalshi proposed settlement on four terms: a no-admit, no-deny resolution, payment of $800.15, a one-year suspension, and a public acknowledgment of the settlement. Moran accepted three of the four on the date Kalshi set for a response. He declined only the public acknowledgment.

4. Kalshi thereafter abandoned its own $800.15 valuation and imposed a five-year suspension, a $6,229.30 financial penalty, and disgorgement, and publicly stated that Moran had repeatedly refused to resolve the matter via settlement and had stopped responding to further correspondence.

5. The settlement correspondence, Kalshi's published no-prejudice rule for failed settlement negotiations, the disparity between Kalshi's own valuation and the penalty it imposed, the comparator matters, and Kalshi's public description of Moran's settlement response Moran pleads below. Moran does not allege that the chronology alone proves retaliatory motive.

6. Moran asserts three claims. Count I alleges that KalshiEX enforced its rules against him in bad faith, in violation of section 22(b) of the Commodity Exchange Act. Count II alleges that the same conduct breached the Member Agreement and the Rulebook it incorporates. Count III seeks declaratory and injunctive relief on the claims proved. Moran seeks individual damages and corrective relief. He does not ask this Court to authorize candidate trading.

7. The following documents are attached and incorporated under Fed. R. Civ. P. 10(c). Exhibit A is the Notice of Disciplinary Action, File No. KE-2026-0003. Exhibit B is the Notice of Disciplinary Action, File No. KDA-2026-0002. Exhibit C is the Notice of Settlement, File No. KDA-2026-0004. Exhibit D is the Notice of Settlement, File No. KDA-2026-0005. Exhibit E is the Kalshi Exchange Rulebook v.1.18, effective July 1, 2025. Exhibit F is the Kalshi Member Agreement, version 1.6. Exhibit G is Moran's Statement of Candidacy

filed with the Federal Election Commission on April 14, 2026. Exhibit H is the Kalshi Exchange Rulebook v.1.17, effective May 2, 2025. Exhibit I is the Kalshi Trading Prohibitions page. Exhibit J is the settlement correspondence between Kalshi and Moran dated January 27 through February 13, 2026. Exhibit K is Moran's written response to Kalshi's February 2, 2026 settlement proposal, dated February 13, 2026. Exhibit L is the Notice of Settlement, File No. KDA-2026-0009 (Buckhout). Exhibit M is the Notice of Settlement, File No. KDA-2026-0007 (Midgley). Exhibit N is the Notice of Settlement, File No. KDA-2026-0008 (Cloobeck). Exhibit O is the Notice of Settlement, File No. KDA-2026-0011 (Perez). Exhibit P is the November 12, 2025 text message exchange between Moran and Jaron Zhou. Exhibit Q is the January 21, 2026 text message exchange between Moran and Jaron Zhou.

## PARTIES

8. Plaintiff Mark Robert Moran is a natural person and a citizen of Virginia, residing in the City of Falls Church, Virginia. He is an attorney, former investment banker, business founder, and a 2026 candidate for the United States Senate from Virginia. His Statement of Candidacy on file with the Federal Election Commission lists FEC Identification Number S6VA00218 and designates Friends of Mark Moran as his principal campaign committee. FEC Form 2, Statement of Candidacy (Apr. 14, 2026) (Ex. G).

9. He is a graduate of the College of William and Mary and holds a law degree and a business degree from the University of Virginia. He worked in investment banking on mergers and acquisitions, founded an investor relations firm, and has been the subject of national news coverage, including coverage

of his Senate candidacy and of his public statements about political prediction markets. Kalshi did not create that recognition and did not pay for it.

10. Defendant KalshiEX LLC is a Delaware limited liability company with its principal place of business in New York, New York. Kalshi's own rulebook states that "KalshiEX LLC ('Kalshi' or the 'Company') is a Delaware limited liability company." Kalshi Exch. Rulebook r. 2.1 (v.1.18, July 1, 2025). KalshiEX operates as a Commodity Futures Trading Commission-designated contract market and runs the Kalshi exchange and lists event contracts for trading, including contracts offered to persons in Virginia.

11. Defendant Kalshi Inc. is a Delaware corporation headquartered in New York, New York, and is the parent company of KalshiEX LLC. In a disclosure statement filed in the District of Maryland on August 20, 2026, Kalshi Inc. and KalshiEX LLC identified "Corporate Parent Kalshi Inc. for Kalshiex LLC." Disclosure Statement, City of Baltimore ex rel. Thompson v. Kalshiex LLC, No. 1:26-cv-03217 (D. Md.) (ECF No. 8). KalshiEX's CFTC-filed operating agreement likewise identifies Kalshi Inc. as KalshiEX's member. On information and belief, Kalshi Inc. remained KalshiEX's sole member during the relevant period. The same disclosure identifies six additional affiliates of Kalshi Inc.: Kalshi Klear Inc., Kalshi Klear LLC, Kalshi Klear 2 LLC, Kalshi Prime LLC, Kalshi Trading LLC, and Kalshi UK Ltd. Id. The precise allocation of product-listing, marketing, disciplinary, publication, technology, and commercial-use functions among these entities is within Defendants' possession and will be established through discovery.

12. At all relevant times, Defendants acted through their officers, directors, employees, agents, affiliates, committees, and contractors within the scope of their authority. Moran will amend entity-specific allegations if discovery or verified corporate records warrant.

13. Except where a specific entity is named, this Complaint uses "Kalshi" to refer to the conduct of KalshiEX LLC and Kalshi Inc. collectively, without conceding that the conduct of either is attributable to the other. Where liability depends on the acts of a particular entity, Moran alleges the acts of that entity by name, and the allocation of the product-listing, market-definition, settlement, marketing, disciplinary, publication, and technology functions between them is within Defendants' possession and will be established through discovery.

## JURISDICTION AND VENUE

14. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Count I arises under section 22(b) of the Commodity Exchange Act, 7 U.S.C. § 25(b). Section 25(c) provides that the United States district courts have exclusive jurisdiction of actions brought under section 25. The same subsection requires that any action under section 25 "be brought not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). The conduct on which Count I rests occurred between January and April 2026, and this action is brought within two years of it.

15. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the related state-law claims because they arise from the same markets, transactions, settlement process, disciplinary enforcement, and resulting injuries.

16. The state-law claims do not substantially predominate over Count I within the meaning of 28 U.S.C. § 1367(c)(2). They arise from the same listings, the same transactions, and the same enforcement conduct. In any event, and independently of section 1367, this Court has original jurisdiction over each

state-law claim under 28 U.S.C. § 1332 for the reasons stated in paragraph 17, so declination under section 1367(c) would not remove those claims from this Court.

17. Independently, and in the alternative, this Court has diversity jurisdiction under 28 U.S.C. § 1332. Moran is a citizen of Virginia. Kalshi Inc. is a Delaware corporation with its principal place of business in New York, New York. On information and belief, Kalshi Inc. is the sole member of KalshiEX LLC, and KalshiEX therefore shares Kalshi Inc.'s citizenship. The amount in controversy exceeds $75,000, exclusive of interest and costs, based on the compensatory, statutory, punitive, restitutionary, and equitable relief placed in controversy. Defendants have taken the same position in their own filings. In removing Smith v. Kalshi, Inc., No. 1:26-cv-12413 (D. Mass.), they stated that "[t]he sole member of Robinhood Derivatives, LLC is Robinhood Markets, Inc.," applied the rule that an unincorporated entity takes the citizenship of its members, and represented that the Kalshi entities are "incorporated or have their principal place of business in Delaware, New York, and Pennsylvania." Notice of Removal ¶¶ 13–17 (May 28, 2026).

18. Defendants purposefully directed the challenged conduct into Virginia. They offered the platform and the relevant contracts to Virginia users. They named a Virginia political candidate and his political conduct as market subjects. They transacted and communicated with Moran in Virginia, and they published the challenged disciplinary notice concerning his Virginia candidacy.

19. Moran has Article III standing. He traded in the market Defendants built around his own candidacy, and Defendants imposed a monetary penalty and ordered disgorgement on account of those trades. He is the person whose name Defendants used as the label and settlement term of the contracts at issue. The injury is concrete and particularized, it is fairly traceable to Defendants' own

listing, enforcement, and publication decisions, and it is redressable by the damages and corrective relief sought. Moran does not sue over contracts he did not trade or over conduct directed at other persons.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred here and Moran suffered a substantial part of the alleged injury here.

21. Venue is proper in the Alexandria Division. Local Civil Rule 3(C) provides that "[c]ivil actions for which venue is proper in this district shall be brought in the proper division, as well," and that the venue rules of 28 U.S.C. § 1391 apply "as if the terms 'judicial district' and 'district' were replaced with the term 'division.'" E.D. Va. Loc. Civ. R. 3(C). The Alexandria Division comprises the City of Alexandria, the Counties of Loudoun, Fairfax, Fauquier, Arlington, Prince William, and Stafford, and "any other city or town geographically within the exterior boundaries of said counties." E.D. Va. Loc. Civ. R. 3(B)(1). The City of Falls Church lies within those exterior boundaries.

22. Moran preserves all arguments concerning the formation, delegation, scope, waiver, unconscionability, and enforceability of any forum-selection or arbitration provision Defendants may invoke, and alleges that no Rulebook provision delegates questions of arbitrability to an arbitrator.

23. This Court applies the choice-of-law rules of Virginia. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). The Member Agreement selects New York law, and Count II is pleaded under it.

## FACTUAL ALLEGATIONS

### A. Kalshi built a market on a decision only Moran could make

24. On November 12, 2025, Moran asked Kalshi's Head of Politics, Jaron Zhou, by text message whether he could be added to a Kalshi market on who would run for public office, noting that he had told the New York Post he was considering a run. Zhou replied that the market would be live the next day and confirmed that Moran would be added. Text messages between Moran and Jaron Zhou (Nov. 12, 2025) (Ex. P). In November 2025, Kalshi listed a market titled "Who will run for public office this year?" with Moran's name as one of the strikes on which the public could buy and sell positions. Moran did not draft the market rules, set the settlement terms, or receive any compensation, and no writing between Moran and Kalshi addressed whether Moran could trade in the market.

25. Moran's strike settled on a single question, which was whether Moran would become a candidate. The market's published rules state that a strike "Resolves Yes if [the named person] has announced they will run for an elected public office in the 2026 election after Issuance and before Nov 3, 2026, including running for the nomination of any political party to contest that office," that "[t]he person must publicly announce their campaign," and that "[t]his market will close and expire early if the person announces their candidacy." Moran could answer that question himself. He could announce, or decline to announce, and either act would settle the contract.

26. Kalshi offered positions in that contract to the public and charged fees on the resulting transactions. Kalshi lists the market under Series KXRUNBYMIDTERM and Event KXRUNBYMIDTERM-26NOV03. The

market opened on October 9, 2025 and closes no later than November 3, 2026. Kalshi reports cumulative volume in the market of $136,045.

27. On November 13 and 14, 2025, while the market was open to the public and before he had announced any decision, Moran placed ten orders in it. Kalshi calculated the value improperly traded on Moran's own candidacy at $100.05, a figure implied by its own February 2 settlement arithmetic. Email from Kalshi Legal Dep't to Mark Moran (Feb. 2, 2026) (Ex. J). Moran described the position to Kalshi as "like $140 or so" when he disclosed it on January 27, 2026. Kalshi's records show the exact orders, fills, fees, gains, losses, and account consequences.

28. Third parties took real-money positions on Moran's decision and tracked it. On January 21, 2026, the day Moran announced his candidacy, a trader posted to the market's public activity feed while holding a position labeled "Yes · Mark Moran," writing "when will this close? he has officially announced his running." A second trader posted the same day, also holding a position labeled "Yes · Mark Moran," writing "mark has just announced his campaign." Those posts remain publicly available on the market page.

29. On January 21, 2026, Moran publicly announced his candidacy for United States Senate from Virginia.

30. On January 21, 2026, Moran asked Zhou by text message whether Kalshi could list a market on whether he would beat Mark Warner in the Virginia Democratic Senate primary, and said he could bring attention to it. Zhou replied that he would add Moran to the "Democratic nominee for Senate in Virginia?" market, going live at 7:00 p.m. that day. Text messages between Moran and Jaron Zhou (Jan. 21, 2026) (Ex. Q). Kalshi later added Moran as a strike in a market titled "Virginia Democratic Senate nominee?" Kalshi's Notice states that Moran "announced himself as a candidate in the Democratic

Primary election for U.S. Senator of Virginia on January 21, 2026." Notice of Disciplinary Action, File No. KE-2026-0003. Moran entered the Democratic primary in January 2026 and later left it. On April 14, 2026 he filed a Statement of Candidacy with the Federal Election Commission designating himself an independent candidate. FEC Form 2, Statement of Candidacy (Apr. 14, 2026) (Ex. G). Both descriptions are accurate as of their dates.

31. Although Moran placed two trades in the nomination market on January 27, 2026 and discussed that market publicly, the nomination market settles on an aggregate result rather than on any act within Moran's own authority.

32. Moran does not seek a declaration that those trades were authorized under Kalshi's decision-maker rule. The legal distinction in this action is between a restriction on participant trading and Defendants' separate conduct in creating, monetizing, and enforcing products that use a living person's identity and controlled political acts.

**B. Kalshi's own rule identified the controlled-act conflict**

33. The rule Kalshi charged is a restriction on a Trader. As *quoted in* the Notice, it provides:

> If a Trader is a decision maker, either directly or indirectly, or has any influence, directly or indirectly, no matter the scale and importance of the influence, on the outcome of the Underlying (event) of any Contract, that Trader is prohibited from attempting to enter into any trade, either directly or indirectly, on the market in such Contracts.

Notice of Disciplinary Action, File No. KE-2026-0003. The rule restricts a Trader. It does not authorize Kalshi to use a person's name as a market strike.

34. The Notice identifies that prohibition as "Rule 5.17(z)." The rulebook in force when Moran traded so designated it. Kalshi Exch. Rulebook r. 5.17(z) (v.1.18, July 1, 2025) (Ex. E). In the immediately preceding version the same

prohibition was Rule 5.15(y), and Rule 5.17 was titled "Position Limits." Kalshi Exch. Rulebook rr. 5.15(y), 5.17 (v.1.17, May 2, 2025) (Ex. H). Kalshi charged Langford under "Rule 5.17(z)" for conduct on May 24, 2025, when that designation did not yet exist. Notice of Disciplinary Action, File No. KDA-2026-0002 (Ex. B).

35. Kalshi's public-facing Trading Prohibitions page cites a third rule number for the same prohibition. That document states: "Pursuant to Kalshi Rule 5.13(s), you are prohibited from participating in a contract if you are either (i) an employee of the source agency, (ii) have material non-public information regarding this contract, or (iii) have the ability to influence the outcome of the contract." Kalshi, Trading Prohibitions (Ex. I). The Notice charges Rule 5.17(z), which is the designation the rulebook then carried. The document Kalshi publishes to inform Members which contracts they may not trade designates the same prohibition Rule 5.13(s), and states it in broader terms, reaching any person who has "the ability to influence the outcome of the contract." The page also enumerates, contract by contract, the Source Agencies whose employees are barred from trading, and it does not list the market on which Moran was named.

36. The Notice also quotes the prohibition inaccurately, in two respects. The rule in force provided that a decision maker "is prohibited from attempting to enter into any trade or entering into any trade." The Notice omits the words "or entering into any trade" and states only that such a Trader "is prohibited from attempting to enter into any trade." The rule also reaches a Trader who "has any influence, either directly or indirectly." The Notice drops the word "either" from that clause. Compare Kalshi Exch. Rulebook r. 5.17(z) (v.1.18, July 1, 2025), with Notice of Disciplinary Action, File No. KE-2026-0003. Both alterations appear in every other candidate notice Kalshi has published under

the rule, from February through August 2026. Notice of Disciplinary Action, File No. KDA-2026-0002 (Ex. B); Notice of Settlement, File No. KDA-2026-0004 (Ex. C); Notice of Settlement, File No. KDA-2026-0005 (Ex. D); Notice of Settlement, File No. KDA-2026-0009 (Ex. L); Notice of Settlement, File No. KDA-2026-0007 (Ex. M); Notice of Settlement, File No. KDA-2026-0008 (Ex. N).

37. The Notice states that “Moran was listed as a strike for the market ‘Who will run for public office this year?’” and that “Moran qualified as a direct decision maker for this contract and had direct influence on the outcome of the Underlying event.” Notice of Disciplinary Action, File No. KE-2026-0003. Kalshi made the same finding as to the nomination market. *Id.*

38. Kalshi sold positions in that contract to third parties on an occurrence Moran could cause or prevent.

39. Kalshi’s own contract terms describe a listed person as a market. The trading prohibitions published for the first market state that “[t]he following are prohibited from trading this contract,” and include “[a]ny candidate currently listed as a market within this event.” Kalshi thus treats the named individual as the market itself, not as the subject of a report about the market.

40. Moran uses the term participant-controlled discrete political act to mean a purposeful and objectively verifiable act within a named person’s own authority, such as an announcement, filing, withdrawal, or resignation, as distinct from an aggregate outcome such as an election or a nomination.

41. Kalshi drafts a recurring family of contracts that settle on a named person’s own act and that designate that person as a Source Agency. In the LEAVEOFFICE contract, “[t]he Underlying for this Contract is official announcements and actions regarding <person>’s departure from <office>,” and “[t]he Source Agencies are <person>, the office or organization where

<person> holds <office>," followed by news organizations. In the DROPOUT contract, "[t]he Source Agencies are <person>, official campaign sources," followed by news organizations. Kalshi's published Trading Prohibitions list likewise identifies "<candidate>" and "official campaign announcements from <candidate>" as Source Agencies for the ENDORSE contract. In each, the named individual is not merely the subject of the contract. Kalshi designates the individual as a source of the settlement determination.

42. The rule Kalshi charged reaches a Trader who "is a decision maker, either directly or indirectly, or has any influence, either directly or indirectly, no matter the scale and importance of the influence, on the outcome of the Underlying (event) of any Contract." Kalshi Exch. Rulebook r. 5.17(z) (v.1.18, July 1, 2025). Kalshi applied it to Moran by finding him a direct decision maker over the first market.

43. When Kalshi offered that contract to the public, outside traders acquired financial interests in whether, when, and how Moran would act. Moran faced a body of strangers holding money on his decision, some of whom profited if he acted and some of whom profited if he did not.

**C. Settlement, discipline, and the no-prejudice rule**

44. Although Kalshi's public notice states that during a January 28, 2026 call Moran acknowledged the trades were improper under Kalshi's rules, the permissibility of Moran's own trading is not what this action challenges. This action challenges Kalshi's use of Moran's name as the label and settlement term of a product it sold.

45. On February 2, 2026, Kalshi's Legal Department transmitted a written settlement proposal on four terms: "Settlement by you on a no admit, no deny basis, resolving this matter finally"; "Payment of a penalty of $800.15 (treble

the value you improperly traded on your own candidacy, plus a $500 penalty)"; "1 year suspension from Kalshi"; and "Public acknowledgement of this settlement by you." Email from Kalshi Legal Dep't to Mark Moran (Feb. 2, 2026) (Ex. J).

46. The February 2 proposal disclosed Kalshi's own valuation of the matter and the method by which it reached that figure. Kalshi set the monetary term at $800.15 and stated that the figure was treble the value improperly traded plus a $500 penalty. Id. The traded value implied by that calculation is $100.05.

47. On February 6, 2026, Kalshi's Head of Enforcement and Legal Counsel wrote again, stating: "We are contacting you again to request your response to our settlement proposal. If we do not receive any response from you by next Friday, February 13, 2026, we will proceed to issue a Notice of Charges in this matter and begin formal disciplinary proceedings." The message closed, "It remains our preference to resolve this matter via settlement, if possible." Email from Robert DeNault to Mark Moran (Feb. 6, 2026) (Ex. J).

48. Moran responded on February 13, 2026, the date Kalshi set. He transmitted a written response to Kalshi's Head of Enforcement and to Kalshi Compliance that same day. Email from Mark Moran to Robert DeNault (Feb. 13, 2026) (Ex. J). The response states: "I am willing to accept a settlement on a no admit, no deny basis that includes the following terms: 1. Payment of a penalty of $800.15. 2. A one-year suspension from the Kalshi platform." It then states: "However, I must unequivocally decline the proposed term requiring a 'Public acknowledgement of this settlement by you.'" Letter from Mark Moran to Kalshi Legal Dep't (Feb. 13, 2026) (Ex. K).

49. Moran's February 13 response addressed every term Kalshi proposed. He accepted the monetary term in the exact amount Kalshi asked, accepted the suspension term in the exact duration Kalshi asked, accepted the no-admit, no-

deny framing Kalshi proposed, and declined only the public acknowledgment. He gave reasons for that refusal, including that "[t]he scope of permissible penalties in a disciplinary proceeding or settlement is explicitly enumerated in Rule 9.5," which "includes sanctions such as fines, suspensions, and disgorgement, but … does not grant Kalshi the authority to compel a Kalshi user ('Member') to make a public statement." Id.

50. Moran identified the commercial character of the demand at the time it was made. His February 13 response states that a compelled public statement "would also serve as a form of marketing for Kalshi, leveraging my public profile, which is a benefit I am not willing to provide as part of this settlement." Letter from Mark Moran to Kalshi Legal Dep't (Feb. 13, 2026) (Ex. K). Kalshi thus sought, as a term of settlement, a further use of Moran's public identity for its own commercial benefit, and Moran declined to supply it.

51. The response did not close the matter. It states: "I am prepared to resolve this matter promptly based on the two terms I have agreed to above. Please provide the necessary documentation to proceed on that basis, or let me know if Kalshi wish to withdraw the unenforceable demand for a public statement." Id. Moran asked Kalshi to send settlement papers on the terms he had accepted, or to withdraw the term he had refused. The record discloses no response to either request.

52. Moran's February 13 response also contains intemperate language directed at the public-acknowledgment demand, including profanity and a statement that Kalshi "has made an enemy." Moran does not disclaim it. That language is confined to the single term he refused.

53. Kalshi had published the rule that governed what could follow a failed negotiation. Rule 9.3(d) provides that failed settlement negotiations or

withdrawn settlement offers "will not prejudice a Member or otherwise affect subsequent procedures in the rule enforcement process." Kalshi Exch. Rulebook r. 9.3(d) (v.1.18, July 1, 2025). The same provision appeared in the immediately preceding version. Kalshi Exch. Rulebook r. 9.3(d) (v.1.17, May 2, 2025).

54. Kalshi thereafter issued Notice of Disciplinary Action File No. KE-2026-0003 imposing a five-year suspension, a $6,229.30 financial penalty, and disgorgement of profits connected to the trading activity.

55. The disciplinary proceeding ran its course entirely within Kalshi. Kalshi investigated, Kalshi proposed the settlement, Kalshi rejected the counterproposal, Kalshi selected the sanction, and Kalshi published the result. Moran did not file a Part 9 appeal from the Notice, and he does not ask this Court to review the Commission's regulation of Kalshi. He asks this Court to decide claims that arise outside that proceeding and that no exchange procedure resolves.

56. The Notice further stated that Moran "repeatedly refused to resolve this matter via settlement and stopped responding to further correspondence from the Compliance Department." Notice of Disciplinary Action, File No. KE-2026-0003 (Ex. A). Moran responded to Kalshi's initial inquiry on the day he received it, appeared for the call Kalshi requested, and answered the settlement proposal on the deadline Kalshi itself set, accepting three of its four terms.

57. Kalshi publishes its disciplinary notices under Rule 9.4(b), which provides that Kalshi "will make public notice of the disciplinary action by posting on its website, in accordance with Commission Regulation 9.13, the information required by Commission Regulation 9.11." Kalshi Exch. Rulebook r. 9.4(b). Regulation 9.11(b)(3) provides that the notice "must include only" the items it enumerates: the name of the person, the reasons for the action and the rules

charged, the conclusions and findings as to each rule violation, the terms of the action, the dates, and a statement of the availability of Commission review. 17 C.F.R. § 9.11(b)(3). Regulation 9.13 requires the public posting to disclose "at least" that information. 17 C.F.R. § 9.13. Regulation 9.13 requires the public posting to disclose "at least" that information. A description of the member's settlement conduct is not among the enumerated items and is not required by either regulation.

58. Regulation 9.11(e) requires that copies of the notice "must be certified as true and correct by a duly authorized officer, agent or employee of the exchange." 17 C.F.R. § 9.11(e). The identity of the officer who certified the Moran Notice, and the file that officer had when certifying it, are within Kalshi's possession.

59. Kalshi valued this matter at $800.15 on February 2 and stated the method it used, treble the value improperly traded plus a $500 penalty. Applying that method to the final sanction, the traded value would have to be $1,909.77, which is between thirteen and nineteen times any figure in the record. Kalshi instead imposed $6,229.30 on April 22 and stated no method at all. The only intervening event the record discloses is Moran's refusal of the public-acknowledgment term. Rule 9.3(d) provides that failed settlement negotiations "will not prejudice a Member or otherwise affect subsequent procedures in the rule enforcement process." Kalshi Exch. Rulebook r. 9.3(d) (v.1.18, July 1, 2025).

60. Kalshi opened this matter on an insider-trading theory and closed it on a different one. On January 27, 2026, Kalshi Compliance wrote that "[t]he Exchange rulebook, in particular Rule 5.17(y), expressly prohibits all forms of insider trading," and defined an "Insider" as "any person who has access to or is in a position to have access to material nonpublic information." Email from Kalshi Compliance to Mark Moran (Jan. 27, 2026) (Ex. J). In the rulebook then

in force, Rule 5.17(y) is the insider prohibition and Rule 5.17(z) is the decision-maker prohibition. Kalshi Exch. Rulebook rr. 5.17(y), 5.17(z) (v.1.18, July 1, 2025). The Notice charged Rule 5.17(z) and made no finding that Moran held or had access to material nonpublic information.

61. Moran disclosed the position to Kalshi himself. Responding to the January 27 inquiry the same day it was sent, he wrote: “Also, I had put like $140 or so into the market on me to see if it worked or not so feel free to liquidate that position so it’s in compliance.” Email from Kalshi Compliance to Mark Moran (Jan. 27, 2026) (Ex. J). Kalshi’s inquiry had asked only for his availability for a call.

62. The Notice bears an effective date of “April 21, 2025.” That date precedes by roughly seven months the November 2025 conduct the Notice describes, and by nine months the January 2026 conduct it describes. Notice of Disciplinary Action, File No. KE-2026-0003.

63. Kalshi’s disciplinary rules authorize monetary and access sanctions but require penalties to be commensurate with the violation and to account for relevant disciplinary history. Kalshi Exch. Rulebook r. 9.5 (v.1.18, July 1, 2025). Commission Regulation 38.710 provides that all disciplinary sanctions imposed by a designated contract market or its disciplinary panels “must be commensurate with the violations committed and must be clearly sufficient to deter recidivism or similar violations by other market participants,” and that “[a]ll disciplinary sanctions, including sanctions imposed pursuant to an accepted settlement offer, must take into account the respondent’s disciplinary history.” 17 C.F.R. § 38.710 (2026). By its terms the regulation applies the same commensurateness and disciplinary-history requirements to sanctions imposed by settlement and to sanctions imposed by disciplinary action.

64. Kalshi holds the records that explain the $6,229.30 penalty. Those records include how Kalshi calculated the amount, how it treated the February 13

response, what materials it presented to any disciplinary panel, and what role settlement or communications considerations played.

**D. Comparator evidence**

65. Kalshi publicly announced other candidate-related enforcement matters involving its political-insider trading restrictions. The complete comparator universe, underlying trading facts, disciplinary histories, cooperation, settlement terms, disgorgement, and sanction calculations are within Kalshi's possession.

66. On April 21 and 22, 2026, Kalshi published notices in two other candidate matters arising under the same rule.

67. Ezekiel Enriquez announced himself as a candidate. Kalshi added him as a market option for a contract on the Texas Republican primary for the 21st Congressional District. Enriquez then "purchased less than $100 worth of contracts related to his own candidacy, in violation of Rule 5.17(z)." Notice of Settlement, File No. KDA-2026-0004 (Ex. C). Kalshi suspended him for five years and imposed a financial penalty of $784.20. *Id.*

68. Matt Klein announced himself as a candidate. Kalshi added him as a market option for a contract on the Minnesota Republican primary for the 2nd Congressional District. Klein likewise "purchased less than $100 worth of contracts related to his own candidacy." Notice of Settlement, File No. KDA-2026-0005 (Ex. D). Kalshi suspended him for five years and imposed a financial penalty of $539.85. *Id.*

69. Two months earlier, on February 25, 2026, Kalshi published a disciplinary action against another candidate arising under the same rule and on materially identical facts. The Kalshi Disciplinary Committee found that Kyle Langford "had announced himself as a candidate for governor of California," that he

"was added as a market option for a contract on the 2026 California Gubernatorial election," that "[a]s a candidate, Langford qualified as a direct decision maker for this contract and had direct influence on the outcome of the Underlying event," that he "placed two trades on this contract and then promoted them on social media, in violation of Rule 5.17(z)," and that "during a phone call with Kalshi Compliance and Legal Departments, Langford acknowledged that these trades were improper and in violation of the Kalshi Rules." Notice of Disciplinary Action, File No. KDA-2026-0002.

70. Kalshi resolved the Langford matter by disciplinary action rather than settlement, as it did with Moran. It suspended Langford "for a period of 5 years," as it did with Moran, and "imposed a financial penalty of $2,246.36 (disgorgement of the amount related to the improper trading activity covered by this action, plus penalties of $2,000)." *Id.* Kalshi thus separated the penalty from the disgorgement in the Langford notice and fixed the penalty at $2,000. It imposed on Moran a penalty of $6,229.30 "plus disgorgement of any profits," roughly three times the Langford penalty. Notice of Disciplinary Action, File No. KE-2026-0003.

71. Enriquez and Klein resolved their matters by settlement and cooperation, which Kalshi cited in reducing their penalties. Langford did not settle. Like Moran, he was suspended for five years, placed two trades, promoted them on social media, and acknowledged on a call with Kalshi Compliance and Legal that the trades were improper. On that record Kalshi fixed his penalty at $2,000 and Moran's at $6,229.30. Nothing in either notice explains the difference.

72. Kalshi issued a second disciplinary notice on February 25, 2026, in an unrelated matter charging Rule 5.17(y) and Rule 3.6(a) rather than the decision-maker rule. Notice of Disciplinary Action, File No. KDA-2026-0001 (Artem Kaptur). Moran cites it only for its date. Both notices issued on

February 25, 2026 carry an effective date of February 25, 2026. The Moran, Enriquez, and Klein notices, all issued in April 2026, each carry an effective date of April 21, 2025.

73. The notices describe Moran's conduct and the comparators' conduct in materially identical terms. Kalshi added each as a strike or market option after or in connection with a candidacy. Kalshi found each to be a direct decision maker with direct influence on the outcome. Each traded a position Kalshi described as under or about $100. Kalshi suspended each for five years. Kalshi fined Enriquez $784.20, fined Klein $539.85, and fined Moran $6,229.30, which is roughly eight times the larger comparator penalty and roughly twelve times the smaller. The Enriquez and Klein notices attribute the difference to cooperation and settlement, and Commission Regulation 38.710 applies the same commensurateness and disciplinary-history requirements to sanctions imposed pursuant to an accepted settlement offer as to sanctions imposed by disciplinary action.

74. On August 28, 2026, after this action was drafted, Kalshi published three further settlement notices in candidate matters arising under Rule 5.17(z), each approved by the Kalshi Disciplinary Panel and each imposing a three-year suspension.

75. Laurie Buckhout announced her candidacy for a North Carolina congressional seat, and Kalshi added her as a market option. The settlement established that she "purchased less than $1000 worth of contracts related to her own candidacy." Kalshi suspended her for three years and imposed a financial penalty of $2,589.96. Notice of Settlement, File No. KDA-2026-0009 (Ex. L).

76. Ben Midgley announced his candidacy for Governor of Maine, and Kalshi added him as a market option. The settlement established that he "purchased less than $1000 worth of contracts related to his own candidacy." Kalshi

suspended him for three years and imposed a financial penalty of $5,434.30. Notice of Settlement, File No. KDA-2026-0007 (Ex. M).

77. Stephen Cloobeck announced his candidacy for Governor of California, and Kalshi added him as a market option. The settlement established that he "purchased approximately than $10,000 worth of contracts related to his own candidacy." Kalshi suspended him for three years and imposed a financial penalty of $31,770. Notice of Settlement, File No. KDA-2026-0008 (Ex. N).

78. The Cloobeck penalty is 3.18 times the traded value the notice states, which is consistent with the method Kalshi described to Moran on February 2, 2026, a penalty of treble the value traded plus $500. The Midgley penalty of $5,434.30 on less than $1,000 traded is not. Kalshi's notices do not disclose a uniform method. The Moran penalty is roughly 62 times the traded value Kalshi's own February 2 arithmetic implies.

79. Each of the five settlement notices, the two of April 21 and the three of August 28, recites that "the Kalshi Disciplinary Panel" approved the Compliance Department's findings, and each recites that the member cooperated with the inquiry. The Langford notice recites action by "[t]he Kalshi Disciplinary Committee." Moran's Notice recites neither. It states that "[t]he Kalshi Compliance Department established reasonable cause to believe" the facts it describes, names no Panel or Committee, and states that Moran "repeatedly refused to resolve this matter via settlement." Of the seven candidate notices, Moran's is the only one that identifies no adjudicative body.

80. The three candidates who settled in August received three-year suspensions. The two who settled in April, and the two Kalshi described as not settling, received five years. Five of the seven notices state an amount purchased: Enriquez and Klein under $100, Buckhout and Midgley under $1,000, and Cloobeck roughly $10,000. Moran's and Langford's do not. The $100.05

figure for Moran is implied by Kalshi's February 2 proposal and is not allocated between the November and January trades. Of the five stated amounts, only Cloobeck's exceeds the value Kalshi's proposal implies for Moran, and only Cloobeck paid a larger penalty than Moran.

81. On the same day Kalshi published a settlement notice under Rule 5.17(y), the insider-trading rule that requires material nonpublic information, against a federal employee who had loaded a political figure's remarks into a teleprompter and traded on their content. That notice recites that the Commodity Futures Trading Commission concurrently imposed a $65,000 civil monetary penalty and $107,539.02 in disgorgement. Notice of Settlement, File No. KDA-2026-0011 (Ex. O). Kalshi did not charge Moran under Rule 5.17(y), and no Commission proceeding was brought against him.

82. Moran pleads four features of the enforcement process together:

(a) Kalshi imposed a sanction far larger than the ones it reported in comparable matters;

(b) Kalshi published a no-prejudice rule and then let a failed negotiation determine the outcome;

(c) Kalshi conditioned settlement on a public message Moran refused to make; and

(d) Kalshi described Moran's settlement conduct in terms its own file contradicts.

**E. Commercial use of Moran's identity**

**F. Injury and continuing threat**

83. The sanction pleaded in paragraph 54 is the injury underlying Counts I and II. Whether and to what extent Kalshi has collected, debited, withheld, offset, or

frozen account value in satisfaction of the $6,229.30 assessment, and the amount of any disgorged proceeds, appear in Kalshi's account and collection records.

84. Moran seeks the losses the challenged conduct caused him. He does not seek speculative damages for the outcome of an election, damages belonging solely to a campaign committee, or double recovery under overlapping theories.

**G. The federal regulatory record**

85. On July 21, 2026, Moran filed Comment ID CFTC-2026-1189-0064 in Docket CFTC-2026-1189 addressing participant-controlled discrete political or official acts. The comment distinguishes aggregate election outcomes from contracts in which a named natural person's own purposeful act is a necessary or independently sufficient settlement pathway and does not ask the CFTC to permit candidates to trade on contracts they control.

86. The comment explains that a participant-trading prohibition does not, by itself, resolve concentrated control, outside incentives, information concentration, indirect trading, or settlement ambiguity. Moran does not ask this Court to adopt his proposed CFTC rule text.

87. On July 31, 2026, the CFTC entered a consent order involving a Kalshi market on whether George Santos would attend the 2026 State of the Union. The Commission found that Santos traded in an event contract where he could influence the outcome and engaged in conduct designed to affect the contract price. In re George Anthony Devolder Santos, CFTC No. 26-05, Order Instituting Proceedings, Making Findings, and Imposing Remedial Sanctions 2, 5–6 (July 31, 2026).

## COUNT I
### COMMODITY EXCHANGE ACT § 22(b), 7 U.S.C. § 25(b)
### Bad-Faith Enforcement and Violation of Required Rules
### (Against KalshiEX LLC)

88. Moran incorporates paragraphs 1 through 87. KalshiEX enforced its rules against him in bad faith, and Moran seeks the actual damages section 22(b) authorizes.

89. KalshiEX LLC is a registered entity within the meaning of 7 U.S.C. § 25(b)(1), and Kalshi Inc. is its parent.

90. As a designated contract market, KalshiEX LLC is subject to the core principles established by section 5 of the Commodity Exchange Act, 7 U.S.C. § 7. Section 22(b)(1)(A) creates liability for a registered entity that fails to enforce a rule it is required to enforce by section 5, and section 22(b)(1)(C) creates liability for a registered entity that, in enforcing any such rule, violates the Act or any Commission rule, regulation, or order. 7 U.S.C. § 25(b)(1)(A), (C).

91. The decision-maker trading rule Kalshi charged is a rule KalshiEX is required to establish, monitor, and enforce under Core Principle 2, which requires a board of trade to "establish, monitor, and enforce compliance with the rules of the contract market," and under Core Principle 12, which requires it to "establish and enforce rules … to protect markets and market participants from abusive practices committed by any party." 7 U.S.C. § 7(d)(2)(A), (d)(12). KalshiEX's disciplinary procedures, including Rulebook rules 9.3(d) and 9.5, are rules it is required to establish and enforce under Core Principle 13, which requires a board of trade to "establish and enforce disciplinary procedures." 7 U.S.C. § 7(d)(13).

92. KalshiEX's enforcement of the decision-maker trading rule against Moran was therefore the enforcement of a rule within the meaning of section 22(b)(1)(C),

and KalshiEX's conduct in that enforcement is measured against the Commodity Exchange Act, Commission Regulation 38.710, and KalshiEX's own required rules.

93. Moran engaged in transactions on or subject to the rules of KalshiEX.

94. Section 22(b) permits recovery, within its statutory limits, when a registered entity fails in bad faith to enforce a required rule, or violates the Act or a Commission rule, regulation, or order in enforcing its rules, and thereby causes actual losses resulting from a transaction. 7 U.S.C. § 25(b)(1), (4). Bad faith requires more than negligence. It requires "a deliberate wrong rather than just failing to come up to an objective standard of care." *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th 619, 624–25 (7th Cir. 2022) (quoting *Bosco v. Serhant*, 836 F.2d 271, 276 (7th Cir. 1987), and deprecating on other grounds *Bosco*'s discussion of section 22(b)(4)). A bad-faith claim requires two allegations: that the exchange acted or failed to act with knowledge, and that its action or inaction resulted from an ulterior motive. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 780 (2d Cir. 1984) (citing *Sam Wong & Son, Inc. v. N.Y. Mercantile Exch.*, 735 F.2d 653, 671 (2d Cir. 1984)). The motive must be one "unrelated to proper regulatory concerns" that was "the sole or the dominant reason for the exchange action." *Sam Wong*, 735 F.2d at 677.

95. In enforcing its decision-maker rule, KalshiEX was required to comply with applicable Commission disciplinary regulations and its own required rules, including requirements concerning commensurate sanctions, relevant disciplinary history, and the effect of failed settlement negotiations. *See* 17 C.F.R. § 38.710 (2026); Kalshi Exch. Rulebook rr. 9.3(d), 9.5 (v.1.18, July 1, 2025).

96. KalshiEX acted with knowledge. It knew the content of Rule 9.3(d), which it drafted and published, and which states that failed settlement negotiations will not prejudice a Member or otherwise affect subsequent procedures in the rule-enforcement process. It knew the content of Rule 9.5, which it also drafted and published, and which requires penalties commensurate with the violation and consideration of relevant disciplinary history. It knew that Moran had responded substantively to the proposed settlement, because it received his February 13, 2026 counterproposal. It knew the terms it had itself proposed, including the public-message condition Moran rejected. And it knew the sanctions it had imposed in the other candidate matters, because it published them on April 22, 2026. Knowing all of that, KalshiEX published a notice stating that Moran repeatedly refused to resolve the matter via settlement and stopped responding to further correspondence. Moran does not allege that KalshiEX should have known these facts. He alleges that KalshiEX did know them. Regulation 9.11(e) required an authorized officer of KalshiEX to certify the Notice as true and correct. On information and belief, an officer did so with the February 13 response in KalshiEX's file. KalshiEX's Head of Politics had corresponded with Moran directly about adding him to both markets, had discussed with Moran the possibility of a donation to his campaign or a supporting committee, and had told Moran that Kalshi's lawyers were "very cautious with anything campaigns." Whether and when those communications reached the Compliance Department, and what the Compliance Department knew of them when it charged Moran, are recorded in KalshiEX's internal communications.

97. KalshiEX acted in bad faith because an ulterior motive unrelated to proper regulatory concerns, specifically Kalshi's interest in obtaining a public acknowledgment from Moran and in protecting its own reputational and

communications position after Moran declined to supply one, was the sole or the dominant reason for the sanction imposed and for the public description of Moran's settlement conduct. The conduct pleaded in paragraphs 45 through 59 supports that allegation.

98. Each settlement notice recites that the member "cooperated" and agreed to resolve the matter by accepting the Compliance Department's conclusions, paying a financial penalty, and accepting a restriction from trading. No settlement notice recites a public acknowledgment. Moran accepted a penalty and a restriction in the amounts Kalshi proposed, and accepted the no-admit, no-deny term Kalshi itself offered. The single term he declined, a public acknowledgment of the settlement, is one the Rulebook does not authorize Kalshi to impose and one no other candidate's notice records. Kalshi's interest in that term was not a regulatory concern within the meaning of the Act.

99. The statement that Moran "repeatedly refused to resolve this matter via settlement and stopped responding" is not among the items the governing regulations require a notice to contain. Regulation 9.11(b)(3) confines the notice to the person, the rules charged, the findings on each violation, the terms, the dates, and the availability of review. KalshiEX added a characterization of Moran's settlement conduct that neither regulation calls for, that its own file contradicted, and that no other candidate's notice contains.

100. The sanction calculation, the disciplinary panel materials, the internal communications concerning the sanction and the publication, and the comparator records are within Defendants' possession.

101. Independently and in the alternative, KalshiEX acted in bad faith because the challenged enforcement lacked any basis in reason. Moran does not contend that the sanction was less than optimal. He alleges that the record Kalshi produced offers no stated ground for it. The notice bears an effective date

preceding the conduct it adjudicates. Kalshi did not explain the $6,229.30 figure. The published account of the settlement history omits Moran's written response. No stated methodology connects the figure to the commensurateness or disciplinary-history requirements that Rule 9.5 and Commission Regulation 38.710 impose. Moran pleads those allegations above and incorporates them here.

102. Enforcement action for which no basis in reason has been offered is not taken in good faith, even apart from ulterior motive. Sam Wong, 735 F.2d at 678 n.32.

103. KalshiEX's conduct caused Moran actual losses that resulted from his November 13 and 14, 2025 and January 27, 2026 transactions on the KalshiEX exchange.

104. KalshiEX ordered disgorgement of profits connected to those transactions. A disgorgement measured by the proceeds of specified transactions is, by its own terms, a loss that resulted from those transactions. The disgorgement was caused by KalshiEX's enforcement of its rules. Both statutory components are therefore satisfied as to the disgorgement.

105. KalshiEX further imposed a $6,229.30 monetary penalty. The Notice states that "[t]he Compliance Department has issued a penalty suspending Moran from direct or indirect access to Kalshi for a period of 5 years and imposed a penalty of $6,229.30, plus disgorgement of any profits that resulted from the trading connected to this action." Notice of Disciplinary Action, File No. KE-2026-0003. The penalty was calculated by reference to, and imposed on account of, the same transactions. Whether and to what extent KalshiEX has collected, debited, withheld, offset, or frozen account value in satisfaction of that assessment appears in KalshiEX's account and collection records. The imposition of a liquidated monetary penalty on a member account, together

with an order of disgorgement measured by the proceeds of specified trades, is an actual loss resulting from those transactions within the meaning of 7 U.S.C. § 25(b)(1) and (4).

106. KalshiEX also suspended Moran from direct and indirect access to the exchange for five years. The suspension was imposed on account of the same transactions. It deprived Moran of access to an account he had funded and traded, of the ability to close or manage any open position in that account, and of the ability to transact on the exchange for the term of the suspension. That deprivation is an actual loss resulting from those transactions within the meaning of 7 U.S.C. § 25(b)(1) and (4), independent of whether KalshiEX collected the monetary assessment.

107. Under this Count, Moran seeks the actual damages authorized by 7 U.S.C. § 25(b) and nothing else. He does not seek political, reputational, or campaign damages under this Count.

108. Count I does not rest on any allegation that Defendants should have declined to list, should have amended, or should have differently designed the market products described in paragraphs 24 through 43. Moran pleads those allegations as context for Counts III through VI and to establish that concentrated participant control was identifiable and material to Kalshi. Count I rests solely on KalshiEX's conduct in enforcing its rules against Moran after the trades occurred. Moran does not seek recovery under section 22(b) for any failure to propose or amend a contract term.

109. KalshiEX therefore enforced its rules against Moran in bad faith, and that enforcement caused actual losses resulting from his transactions on the exchange. For those losses Moran is entitled to the actual damages authorized by 7 U.S.C. § 25(b).

## COUNT II
## BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
**Pled in the Alternative**
**(Against the Contracting Defendant(s))**

110. Moran incorporates paragraphs 1 through 87.

111. The Member Agreement provides that it "will be governed by the laws of the State of New York." Kalshi Member Agreement § XX (v1.6) (Ex. F). New York law therefore supplies the rule of decision for this Count. The Agreement further provides that "[i]n the event of any conflict between this Agreement and the Kalshi Rulebook, the Kalshi Rulebook will govern," id. § V.B, so the Rulebook provisions pleaded below control over any inconsistent term.

112. Moran and one or more Defendants entered into a contract consisting of the Member Agreement and the Kalshi Exchange Rulebook it incorporates by reference, including the disciplinary procedures in Chapter 9 of that Rulebook. The Rulebook provisions are terms of that contract because the Member Agreement incorporates them, and Moran assented to them as a condition of access to the exchange. The precise versions and assent records applicable to Moran's November 2025 and January 2026 transactions are maintained by Defendants and will govern this Count. Moran does not plead the Rulebook as a source of statutory or regulatory duty under this Count. He pleads it as the text of a promise made to him.

113. Rule 9.3(d), *quoted in* paragraph 53, is a term of that contract. It allocates a specific protection to the Member, and it governs what may follow a failed negotiation.

114. The contract and incorporated rules require the contracting Defendant or Defendants to follow the applicable disciplinary procedures and to exercise contractual discretion in good faith and for proper purposes. Under the

governing law, a covenant of good faith and fair dealing is implicit in all contracts. Where the contract contemplates the exercise of discretion, that covenant "includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (*citing Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 659 (1980)). The covenant embraces a pledge that neither party will do anything that has the effect of destroying or injuring the other party's right to receive the fruits of the contract. *Dalton*, 87 N.Y.2d at 389.

115. The disciplinary provisions of the Rulebook commit substantial discretion to the contracting Defendant or Defendants over whether to bring a proceeding, what sanction to impose within the authorized range, how to weigh disciplinary history, and what to publish about the outcome. The contracting Defendant or Defendants breached the promise pleaded in paragraph 114 in the following respects.

116. The contracting Defendant or Defendants exercised the sanction discretion without applying the methodology Rule 9.5 requires, and imposed an assessment of $6,229.30 without disclosing any commensurateness analysis or any consideration of disciplinary history.

117. The contracting Defendant or Defendants permitted the failure of the settlement negotiation to determine the outcome of the rule-enforcement process, which Rule 9.3(d) expressly forbids. Rule 9.3(d) is a term Defendants wrote, published, and incorporated, and it allocates a specific protection to the Member.

118. The contracting Defendant or Defendants exercised the publication discretion in the manner described in paragraphs 56 and 96, issuing a public statement that Defendants' own file contradicted.

119. The contracting Defendant or Defendants issued a Notice of Disciplinary Action bearing an effective date of April 21, 2025 as to conduct occurring in November 2025 and January 2026.

120. Rule 9.3(d) obligated the contracting Defendant or Defendants to ensure that the failed settlement did not prejudice Moran or affect the subsequent process. They instead treated Moran's written response as an absence of response.

121. Moran pleads the implied covenant as a component of the contract claim, or in the alternative under the law found to govern the operative agreement, and not as an independent tort duplicating that claim.

122. The alleged breaches caused Moran direct monetary injury. That injury is measured by the amounts Defendants assessed against Moran under a process that departed from the contract, and by any amounts Defendants collected, debited, withheld, offset, or froze in satisfaction of that assessment, to the extent the governing agreement and applicable law allow recovery.

123. Moran seeks damages under this Count only to the extent the breach caused monetary loss recoverable under the governing agreement and applicable law. To the extent the appropriate contractual remedy is instead a required re-determination consistent with the governing rules, including reconsideration that accounts for the February 13, 2026 response and applies Rule 9.5 and Commission Regulation 38.710 to the sanction calculation, Moran seeks that relief in the alternative. *See* Dalton, 87 N.Y.2d at 389–90.

124. Moran pleads Count II in the alternative to Count I. Moran does not seek double recovery. To the extent any item of monetary relief is recoverable under both Counts, he seeks it once. Count II does not seek to enforce the Commodity Exchange Act, any Commission regulation, or any duty the Act imposes independently of the parties' agreement. Count II does not ask this Court to review the content of any rule Kalshi adopted, the decision to open a

proceeding, or the finding that Moran's trades violated Rule 5.17(z). It alleges that the contracting Defendant or Defendants did not follow the procedures they promised to follow in reaching and announcing the sanction.

125. The contracting Defendant or Defendants exercised their disciplinary discretion arbitrarily and disregarded a protection the contract conferred on Moran. Moran is entitled to the contractual damages and corrective relief the governing agreement and applicable law allow.

## COUNT III
## DECLARATORY AND INJUNCTIVE RELIEF ON COUNTS I AND II
**28 U.S.C. §§ 2201, 2202; Fed. R. Civ. P. 65**
**(Against Defendants)**

126. Moran incorporates paragraphs 1 through 125. The declarations and injunctive relief sought in this Count rest on the substantive rights asserted in Counts I and II. Sections 2201 and 2202 supply the remedy and do not themselves create a cause of action.

127. An actual controversy within the meaning of 28 U.S.C. § 2201(a) exists between the parties. Moran asserts that KalshiEX enforced its rules against him in bad faith and that the contracting Defendant or Defendants breached the procedures the Rulebook promises. Defendants have taken the contrary position by imposing and publishing the sanction and by standing on the Notice.

128. The controversy is continuing. The five-year suspension remains in force, the published Notice remains posted, and Defendants have not withdrawn the statement that Moran refused to resolve the matter and stopped responding.

129. Moran seeks a declaration that Kalshi Exchange Rulebook Rule 9.3(d) creates an obligation enforceable by a Member, and that a disciplinary sanction

imposed or increased on account of a failed settlement negotiation violates that Rule.

130. If Moran establishes liability under Count I or Count II, he seeks an order directing Defendants to remove from the published Notice, and from any republication of it, the statement that Moran "repeatedly refused to resolve this matter via settlement and stopped responding to further correspondence," and to post a corrected notice for the same period the original has been posted. That relief would not restrain Defendants from publishing the rule charged, the findings on the rule violation, the sanction, or the dates, and would not restrain any other expression concerning Moran.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Enter judgment in Moran's favor on all claims proved;

B. Enter the declarations requested in Count III;

C. Order Defendants to remove from the published Notice of Disciplinary Action, and from any republication of it, the statement that Moran repeatedly refused to resolve the matter via settlement and stopped responding to further correspondence, and to post a corrected notice for the same period the original has been posted;

D. Award Moran actual transaction-linked damages authorized by 7 U.S.C. § 25(b), including any penalty, disgorgement, account value, or other loss actually collected, debited, withheld, offset, frozen, or enforced, as proven;

E. Award Moran contractual damages and appropriate corrective relief to the extent authorized by the operative agreement and governing law;

F. Award pre-judgment and post-judgment interest and taxable costs, and attorneys' fees to the extent any contract, statute, or rule between the parties authorizes an award; and

G. Grant such further legal and equitable relief as the Court deems just and proper.

## JURY DEMAND

Moran demands a trial by jury on all issues so triable.

Dated: [DATE]
Ivy, Virginia

Respectfully submitted,

MARK ROBERT MORAN
By Counsel

____________________________________

Elliott M. Harding, Esq. (VSB No. 90442)
Harding Counsel, PLLC
PO Box 145
Ivy, Virginia 22945
(434) 962-8465
Elliott@HardingCounsel.com

Counsel for Plaintiff